**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| KELVIN HAMPTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-01779-TWP-DLP |
| ) | |
| KRYPEOS, K-9 Officer, RUZI, Custody Officer, ) | |
| HAMMON, K-9 Officer, and PAUL A. TALBOT, ) | |
| M.D. ) | |
| ) | |
| Defendant. ) | |

**ORDER GRANTING DEFENDANT TALBOT'S MOTION FOR SUMMARY JUDGMENTAND DIRECTING ENTRY OF FINAL JUDGMENT**

This matter is before the Court on Defendant Paul A. Talbot's ("Dr. Talbot"), Motion for Summary Judgment (Dkt. 62). Plaintiff, Kelvin Hampton ("Mr. Hampton"), suffered a random act of prison violence while in custody. Another inmate wanted to go into protective custody, so he pummeled Mr. Hampton's head with a "lock in a sock". (Dkt. 13 at 4.) Mr. Hampton sued several people involved, including Dr. Paul Talbot, who treated him after the attack. Because no reasonable jury could find that Dr. Talbot was deliberately indifferent to Mr. Hampton's serious medical need, the Motion for Summary Judgment must be **granted**.

### I.     STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(a). Once the moving party has met its burden, "the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42

(7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court may rely only on admissible evidence. *Cairel v. Alderen*, 821 F.3d 823, 830 (7th Cir. 2016). Inadmissible hearsay must be disregarded. *Id.*

## II.     DISPUTED AND UNDISPUTED FACTS

### A.     The Attack

An inmate in Mr. Hampton's cell house wanted to move into protective custody, so he threw a pot of hot water on another inmate and then attacked Mr. Hampton, who happened to be walking by. (Dkt. 64-2 at 103.) The attacker used a padlock in a sock, which allowed him to strike Mr. Hampton with the lock at high velocity. *Id.*; *see* Dkt. 64-3 at 9. Mr. Hampton tried to run away at first, but then he stopped to think of a way to close the distance, and then "ran up" on his attacker. (Dkt. 64-2 at 111.) In doing so, he put himself within stabbing range. The attacker cut Mr. Hampton twice in the stomach, and he began screaming and ran. *Id.* at 111−12. Custody staff grabbed Mr. Hampton, handcuffed him,[1] and escorted him to medical. *Id.* at 42-43.

---

[1] One of the downsides to being attacked in prison is that it takes some time for prison staff to figure out who is an attacker, who is a mutual combatant, and who is a victim. (Dkt. 64-2 at 43 ("[T]hey don't know who did what, you know what I'm saying? So they going to come and snatch you up, put handcuffs on you").) Indeed, Mr. Hampton spent several days after the attack in segregated housing, where he went on a hunger strike so he could get a mattress instead of sleeping directly on a steel bed. *Id.* at 35.

2

### B. Medical Treatment

In the medical center, a nurse cleaned Mr. Hampton's wounds and noted several "knots and abrasions" on Mr. Hampton's head and face. (Dkt. 64-3 at 30.) The nurse noted that Mr. Hampton had a steady gait and that he was alert and oriented. *Id.* Dr. Talbot sutured a one-inch laceration on Mr. Hampton's head and examined his skull to make sure it was intact. *Id.* at 31. He also tried to give Mr. Hampton a tetanus shot, but Mr. Hampton refused. *Id.*; *see* Dkt. 64-2 at 36.

After the initial treatment, Dr. Talbot directed nurses to do neurological checks twice a day for 72 hours. (Dkt. 64-3 at 33.) But Mr. Hampton never received any further neurological checks after his initial visit with Dr. Talbot. (Dkt. 64-2 at 27) ("I was supposed to have a neuro check, when they see if you got concussions and stuff. I never got that."); *see id.* at 33 ("I might have got a neuro check right then [immediately after the attack]; but the order was for after that, to make sure that I wake up and everything.").

Sometime in the days after the attack, medical personnel provided Mr. Hampton with Tylenol, but it did not help his headaches. (Dkt. 64-2 at 49−50; Dkt. 64-3 at 26.) A nurse practitioner prescribed Mobic for Mr. Hampton's pain and ordered an x-ray of his skull. (Dkt. 64-3 at 24.) The x-ray showed an intact skull and no bone lesions. *Id.* at 22. It also showed bullet fragments from a gunshot wound Mr. Hampton sustained before being imprisoned. *Id.*; *see* Dkt. 64-2 at 70−71. Dr. Talbot met with Mr. Hampton to review the x-ray results. Dkt. 64-3 at 29. He also prescribed Excedrin for Mr. Hampton's headaches. *Id.*

A month after the attack, Mr. Hampton complained that he still suffered from headaches and memory loss. *Id.* at 13. Dr. Talbot prescribed a short course of tramadol for Mr. Hampton's headaches and ordered a "mini-mental status exam"—a short test of cognitive function—once the tramadol reduced Mr. Hampton's pain to a level that would allow him to concentrate. *Id.* at 10.

Mr. Hampton testifies that Dr. Talbot told him the tramadol "was going to get [his] memory back." (Dkt. 64-2 at 27.)  He did not like how the tramadol made him feel.  *Id.* at 73.

Dr. Talbot conducted the mini-mental status examination two days after prescribing tramadol.  (Dkt. 64-3 at 1.)  Mr. Hampton scored a 30 out of 30, and Dr. Talbot found that his short-term memory was intact.  *Id.*  A mental health provider diagnosed Mr. Hampton with post-traumatic stress disorder and noted that Mr. Hampton's memory issues "appear to be stress related." *Id.* at 5−6. Mr. Hampton still struggles with short-term memory loss. (Dkt. 64-2 at 82.)

Around the time of the mini-mental status examination, Dr. Talbot requested and received approval for an off-site "without contrast" CT scan of Mr. Hampton's head. (Dkt. 64-3 at 1, 8−9.) Mr. Hampton reports that "the person who gave the [CT] scan" told him a CT scan without contrast dye would not show any soft tissue and would be no different from an x-ray. (Dkt. 64-2 at 69.) The results of the CT scan are not in the record.

### III.  DISCUSSION

To survive summary judgment on an Eighth Amendment claim based on deliberate indifference to serious medical needs, a plaintiff must point to evidence that would allow a jury to find that (1) he suffered from an objectively serious medical condition, and (2) the defendant knew about his condition and the substantial risk of harm it posed, but disregarded that risk.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Knight v. Grossman*, 942 F.3d 336, 340 (7th Cir. 2019).

Dr. Talbot argues that Mr. Hampton has failed to put forth evidence to satisfy either element.  The Court addresses each in turn.

#### A.  Objectively Serious Medical Condition

In his summary judgment brief, Dr. Talbot argues that Mr. Hampton's only notable injury from the attack was the laceration on his head.  (Dkt. 63 at 11) ("Plaintiff simply had a [one-inch]

4

laceration on his scalp, which required three stitches."). But Mr. Hampton complained of headaches for at least a month after the attack. *See*, *e.g.*, Dkt. 64-3 at 26 ("still having pain in my head"); *id.* at 23 ("daily headaches"); *id.* at 13 ("my head is still killing me"); *id.* at 10 ("persistent daily headaches"). Such pain, depending on the duration and severity, may constitute a serious medical condition. *See Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (holding that jury could find "muscle spasm and the accompanying back pain" were objectively serious); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (holding that chronic pain from hernia "can be an objectively serious medical problem").

Dr. Talbot tries to explain away the headaches as "not new or due to the altercation." (Dkt. 63 at 11.) It is unclear why this would render the headaches not objectively serious. Regardless, Dr. Talbot points to no evidence that Mr. Hampton complained about persistent headaches before the attack. And Mr. Hampton clearly explained in his deposition that his headaches after the attack were worse than any he had previously experienced. (Dkt. 64-2 at 59) ("I probably had headaches [before the attack], but not headaches [that] never went away. This was a headache when I got hit in the head that ain't went away."). Indeed, even Dr. Talbot's examination notes explain that the headaches "appear[] to be worsening ever since hit in head with lock in sock." (Dkt. 64-3 at 9.)

A reasonable jury could find from these facts that Mr. Hampton suffered from prolonged and painful headaches and therefore that Mr. Hampton's head injury constitutes an objectively serious medical condition that Dr. Talbot was obligated to treat.

**B.      Deliberate Indifference**

Dr. Talbot is nevertheless entitled to summary judgment because the undisputed evidence would not allow a reasonable jury to find that he was indifferent to Mr. Hampton's condition.

On the day of the attack, Dr. Talbot stitched up the cut on Mr. Hampton's head, prescribed an antibiotic, and ordered neurological checks. (Dkt. 64-3 at 31.) In the following days, Mr. Hampton then obtained Tylenol and Mobic to treat his headaches, and another provider ordered an x-ray, which was normal. (Dkt. 64-2 at 49−50; Dkt. 64-3 at 24.) When Mr. Hampton reported that Tylenol and Mobic were ineffective, Dr. Talbot prescribed Excedrin. (Dkt. 64-3 at 19.) And when the headaches still persisted, Dr. Talbot gave him tramadol and eventually arranged for a CT scan. *Id.* at 10.

Mr. Hampton asserts that even though Dr. Talbot ordered neurological checks, they were never done. (Dkt. 64-2 at 33−34.) Even assuming the medical staff failed to follow Dr. Talbot's directions, there is no evidence he knew about it. And he was not deliberately indifferent for relying on medical staff to follow his directions. *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018) ("[S]upervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly.").

Mr. Hampton also asserts that he had to "fight for medical care." (Dkt. 64-2 at 87.) As examples, he points to Dr. Talbot's failure to order an x-ray and failure to order a CT scan sooner. *Id.* He also suggests that Dr. Talbot was indifferent for ordering a CT scan without the use of contrast dye. *Id.* at 27, 69. But the choice of whether to order a particular diagnostic test is "'a classic example of a matter for medical judgment,'" and the Court must defer to Dr. Talbot's decision so long as he reasonably exercised that judgment. *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). There is no evidence that Dr. Talbot failed to exercise reasonable medical judgment when he did not order an immediate x-ray or CT scan. And just as importantly, there is no evidence that a quicker x-ray or CT scan would have helped Mr. Hampton's condition in any way. The same is true for the choice of

6

whether to order contrast dye for the CT scan. Mr. Hampton reports that "the person who gave the [CT] scan" said the scan was useless without contrast dye. (Dkt. 64-2 at 69.) But the Court cannot deny summary judgment based on this inadmissible hearsay. *Cairel*, 821 F.3d at 830. And, even if this evidence were admissible, disagreement between medical professionals is not enough to establish an Eighth Amendment violation. *Pyles*, 771 F.3d at 409.

Finally, Mr. Hampton testifies that Dr. Talbot lied to him about the effects of tramadol. (Dkt. 64-2 at 27) ("And then it's a lie. You know, he gave me Tramadol and said it was going to get my memory back."). In contrast, Dr. Talbot testifies that he prescribed tramadol to treat Mr. Hampton's headaches, which allowed him to perform a mini-mental status examination. (Dkt. 64-1 at 4, ¶ 12); *see also* Dkt. 64-3 at 1 ("[W]e were able to examine the patient today including a mini-mental status exam . . . since he was not in pain, could concentrate, and pay attention."). This suggests that any statement about tramadol helping Mr. Hampton's memory was merely a miscommunication. Regardless, there is no evidence that Dr. Talbot failed to exercise reasonable medical judgment when issuing the prescription. On the contrary, Dr. Talbot prescribed the medication to treat Mr. Hampton's headaches, and it worked. So even if Dr. Talbot's explanation to Mr. Hampton was an outright lie, that does not make him deliberately indifferent.[2]

A prisoner is entitled to constitutionally adequate care, not perfect care. Mr. Hampton does not point to sufficient evidence for a jury to find that Dr. Talbot was deliberately indifferent to his medical condition. Dr. Talbot is therefore entitled to summary judgment.

---

[2] Mr. Hampton's amended complaint does not raise a claim based on lack of informed consent. *See* Dkt. 13 at 4, ¶ 26 (alleging that Dr. Talbot "failed to properly address[] Plaintiff['s] injuries from which consisted of, but not limited to, severe concussion, lacerations and cuts by failing to give any kind of [neurological] examinations, [CT] scans and or other."). Indeed, the Amended Complaint does not mention anything about Dr. Talbot's alleged lie—or even the tramadol prescription more generally. *Id.* Nor does Mr. Hampton argue such a claim in his summary judgment response. *See generally* Dkt. 72.

## IV. CONCLUSION

Dr. Talbot's Motion for Summary Judgment, (Dkt. [62]), is **GRANTED**. All claims in this matter have been resolved, and final judgment shall now enter.

**SO ORDERED.**

Date: 7/26/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kelvin Hampton, #900142
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

David C. Dickmeyer
INDIANA ATTORNEY GENERAL'S OFFICE
David.Dickmeyer@atg.in.gov

Zachary Robert Griffin
INDIANA ATTORNEY GENERAL'S OFFICE
zachary.griffin@atg.in.gov

Mollie Ann Slinker
INDIANA ATTORNEY GENERAL'S OFFICE
mollie.slinker@atg.in.gov

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Erika Lauren Steuerwald
KATZ KORIN CUNNINGHAM, P.C.
esteuerwald@kkclegal.com